Filed 2/3/22  Achilli v. Garcia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ALEXANDRA ACHILLI,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ESEQUIEL "PAUL" GARCIA,<br><br>Defendant and Appellant. | H044731<br>(Santa Clara County<br>Super. Ct. No. 110CV166426) |

Alexandra Achilli (Achilli) sued Esequiel "Paul" Garcia (Garcia) and others for the murder of her father.  Garcia appeals the resulting judgment, arguing (1) his due process rights were violated because he was not physically present for the civil jury trial on damages; (2) the $20 million award of noneconomic damages was excessive; and (3) the $1 million award of punitive damages was unsupported by any evidence of his financial condition.

We conclude, based on the record, that Garcia suffered no deprivation of due process.  The award of noneconomic damages was within the jury's discretion.  But to sustain an award of punitive damages, even for reprehensible conduct, Achilli was obliged to present evidence of Garcia's financial condition, which was a legal precondition to the award of punitive damages.  Because she did not do so, we reverse the judgment solely as to the punitive damages award.

# I. FACTUAL AND PROCEDURAL BACKGROUND[1]

In June 2007, approximately nine months before he was killed, Mark Achilli and his business partner sold two restaurants to Garcia: Mountain Charley's and 180 Restaurant (the 180).

After acquiring the restaurants, Garcia became romantically involved with Tessa Donnely, Mark Achilli's sometime girlfriend. Jealous over Mark Achilli's continuing relationship with Donnely, Garcia asked Daniel Chaidez, a bouncer at the 180, to arrange for Mark Achilli's murder. For assistance, Daniel Chaidez enlisted his cousin, Miguel Chaidez, who in turn recruited Lucio Estrada. Another man, Robert Jacome, drove Estrada from southern California to Los Gatos, California, where Mark Achilli lived. On March 14, 2008, Estrada fatally shot Mark Achilli eight times in the face and chest.

Achilli filed a civil lawsuit against Garcia on March 12, 2010.

On October 26, 2010, Garcia was convicted of the first-degree murder of Mark Achilli and sentenced to life in prison without the possibility of parole.

On March 24, 2016, following the affirmance of Garcia's criminal conviction, the denial of his first petition for writ of habeas corpus, and our Supreme Court's denial of his petition for review, the trial court granted summary adjudication as to liability, leaving only damages to be decided at trial.

Trial was held from December 12 through 14, 2016. The morning of December 12, 2016, Garcia, who was at that time incarcerated at Ironwood State Prison, appeared telephonically at the pretrial conference. Garcia told the court that he did not intend to "attend[] this proceeding," explaining that he needed to spend what would otherwise be trial time working on other litigation in which he was involved. The court then cancelled its prior arrangements for prison staff to make Garcia available for jury selection.

---

[1] We take the facts from the transcript of the pretrial conference and trial.

2

Garcia was absent for the duration of the trial.

The jury awarded Achilli $125,008 in economic damages, $20 million in noneconomic damages, and $25 million in punitive damages. The jury allocated 70 percent of the damages to Garcia.

Garcia filed motions for new trial and for judgment notwithstanding the verdict. The trial court denied the motion for judgment notwithstanding the verdict. The trial court conditionally granted the motion for new trial, on the ground that "the amount of [$25 million] is excessive in terms of the third factor, the Defendant's financial condition, even when considering the unique circumstance of the case[,]" but provided the motion would be denied if Achilli consented to a reduction of punitive damages to the sum of $1 million against Garcia. As noted in the trial court's March 3, 2017 order, Achilli consented to the reduction at the hearing on the motions, and the trial court accordingly denied the motion for new trial.

## II.     DISCUSSION

Garcia's appeal asks us to consider the scope of the trial court's independent duty to secure his participation at trial, and whether the awards of noneconomic and punitive damages were, on this record, excessive. We conclude that the sole prejudicial error lay in the award of punitive damages.

### A. Scope of Appellate Review and the Record on Appeal

Although Garcia does not challenge the trial court's grant of summary adjudication as to liability, he has asserted in his briefing and at oral argument that his conviction in the underlying criminal case is still subject to collateral proceedings. He relies upon the United States District Court's determination that his unexhausted claims are "potentially meritorious" as a basis for predicting that the federal court will eventually vacate the criminal conviction. He further asserts he has new evidence that will be a part of an eventual motion to vacate his conviction pursuant to Penal Code

3

section 1170.95. Garcia contends that if the criminal conviction were to be vacated, this would require the civil judgment to be vacated as well.

In support of this argument, Garcia seeks to "incorporate by reference" all documents and records in his criminal appeal (*People v. Esequiel Paul Garcia et al.* (Mar. 2, 2015, H036346) [nonpub.opn.] and his pending federal habeas proceeding (*Esequiel "Paul" Garcia v. Rathel Fisher, Warden* (N.D. Cal.) No. 16-CV-05301-BLF (PR)). Alternatively, he requests that we take judicial notice of these records. Garcia does not, however, establish the relevance of any particular record from his criminal appeal or federal habeas to our resolution of the instant civil appeal. What we glean from his briefing is that these relate to liability for the murder of Mark Achilli, which the trial court summarily adjudicated prior to the jury trial on damages in view of the undisputed finality of Garcia's conviction on direct appeal.

Speculation as to the outcome of Garcia's federal habeas proceeding or future litigation in the trial court has no bearing on Garcia's direct appeal from the civil judgment, which we review solely for reversible error in the civil trial process itself. Accordingly, we deny his request for judicial notice and may not consider his argument that he was wrongly convicted, or that his final conviction might someday be upended through collateral channels. (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 ["Although a court may judicially notice a variety of matters [citation], only *relevant* material may be noticed."].)

Garcia also objects that the clerk's transcript is incomplete because it omits his motions for new trial and judgment notwithstanding the verdict. We note that despite Garcia's untimely designation of these two motions, the clerk's transcript was supplemented with both on October 28, 2021, after the parties' briefs were filed. Many of the exhibits that had been attached to the motion for new trial are missing, and the superior court clerk has certified that they cannot be found despite diligent search. Although the omission of these exhibits is troubling, it is clear from Garcia's

4

identification of the exhibits in the motion's table of exhibits and his citation to them in his appellate briefing that the missing exhibits relate principally to the issue of liability for the murder of Mark Achilli, which is not the subject of Garcia's three claims on appeal.

## B. Right of Access to Court for Trial

Garcia argues the trial court denied him due process by conducting the trial outside of his physical presence and should instead have either granted earlier motions he made to continue the trial,[2] or else appointed counsel to represent him. We conclude that Garcia's decision to not participate personally in the trial and his failure to request alternative means of access are fatal to his claim on appeal.

The right to due process of law encompasses "the right to protect one's property in a court of law . . . ' "at a meaningful time and in a meaningful manner." ' [Citation.]" (*Payne v. Superior Court of Los Angeles County* (1976) 17 Cal.3d 908, 911 (*Payne*).) But the long-standing recognition of this right "does not necessarily mandate a particular remedy." (*Id.* at p. 923.) "A prisoner may not, for example, compel a trial court to appoint counsel. [Citations.] The right of an indigent prisoner to appointed counsel in a civil action arises only when there is a bona fide threat to his or her personal or property interests and no other feasible alternative exists. [Citations.] Nor may a prisoner ordinarily compel his or her appearance in court. [Citations.]" (*Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 793-794 (*Wantuch*).) Moreover, a party may intentionally relinquish or abandon a known right. (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 745 (*Smith*); see also *Taylor v. United States* (1973) 414 U.S. 17, 19-20 [voluntary absence from trial resulted in waiver of right to be present].) "The intent to waive may be expressed in words, either oral or written, or implied by a party's conduct." (*Smith*, *supra*, 182 Cal.App.4th at p. 745.)

---

[2] These motions are not part of the record on appeal.

5

At the pretrial conference, Garcia explained his decision not to participate at trial as follows: "Based on my current outstanding litigation in . . . matters that I'm currently representing myself in at this time. And I need time to be able to go to the law library. As being an incarcerated inmate, I only have access to the library in the morning during my nonwork hours, and that's assuming the library is open to staffing and nonprogram issues that are pending at the institution. And those hours being 8:30 to 10:45. [¶] I have a nonpaid position here at the facility that I need to report to beginning at 12:30 to 9:00 p.m., which is a building porter position. [¶] So that being said, having an upcoming deadline to be able to prepare, and the library not being open on the weekend, by attending this proceeding, it would be prejudice to me in all my criminal activity -- in criminal pending activity because I would not be able to get a response in."

The trial court responded: "Okay, sir. As a result of these cases—and you indicated that you need to spend time working on them—. . . it's my understanding based on that, you are not going to appear in this civil trial; is that correct?" Garcia confirmed that the trial court was correct but reasserted that he was innocent of Mark Achilli's murder.

The trial court asked again, "Mr. Garcia, you will not be appearing this afternoon; is that correct?" When Garcia again confirmed his intentions, the trial court instructed Deputy Lou Lee that it was unnecessary to return Garcia for the scheduled commencement of trial.

This record makes clear that Garcia understood that he had the right to participate at least telephonically in the trial on damages but elected not to do so. Garcia did not assert that telephonic access was inadequate; instead, upon questioning by the trial court, he indicated that he preferred to spend the time in other ways.

Garcia's waiver of telephonic participation did not waive his right to other means of access to the court proceedings, but it does not follow that he had the right to be personally present or to the appointment of counsel or a corresponding right to be so

6

advised by the trial court. His reliance on California Rules of Court, rule 3.670[3] and Code of Civil Procedure section 367.5 is misplaced. Although rule of court 3.670 provides that a litigant is generally required to appear personally for trial, it also expressly authorizes a court to permit a party to appear by telephone. (Rule 3.670(f)(3).) Code of Civil Procedure section 367.5 lists conferences and hearings at which a party may appear by telephone. The fact that it does not include trials in the list does not signify that a party is precluded from appearing at trial by telephone. Similarly to rule 3.670, Code of Civil Procedure, section 367.5 provides that a party may appear by telephone at "[a]ny other hearing, conference, or proceeding if the court determines that a telephone appearance is appropriate." (Code Civ. Proc., § 367.5, subd. (b)(7).) An incarcerated litigant's right of access in ordinary civil proceedings may be secured by a variety of methods, including but not limited to "use of closed[-]circuit television or other modern electronic media[.]" (*Wantuch*, *supra*, 32 Cal.App.4th at p. 793; cf. Pen. Code, § 2625 [codifying court's authority to order prison to produce incarcerated litigant in proceedings involving litigant's parental or marital rights].)

Garcia certainly could have objected in the trial court that telephonic appearance would be inadequate for meaningful trial participation, had he in fact wished to participate. He did not, and he thereby forfeited any claim as to the adequacy of the access he would have been afforded. "It is well established that appellate courts will ordinarily not consider errors that 'could have been, but were not raised below.' [Citations.] . . . 'The policy behind the rule is fairness.' [Citation.] 'Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. [Citation.] In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack. [Citation.] Bait and switch

[3] All further references to the rules are to the California Rules of Court unless otherwise stated.

on appeal not only subjects the parties to avoidable expense but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier.' [Citation.]" (*Findleton v. Coyote Valley Band of Pomo Indians* (2018) 27 Cal.App.5th 565, 569-570.)

Nor did the trial court have a sua sponte duty to provide Garcia increased access to the court proceedings without request or objection. Cases requiring the trial court to secure access to court for an indigent litigant in prison have generally involved a request or some other indication that the litigant desires greater access to court but lacks the means to secure it without court intercession. (*Wantuch*, *supra*, 32 Cal.App.4th at p. 791 [request for appointment of counsel]; *Apollo v. Gyaami* (2008) 167 Cal.App.4th 1468, 1474-1475 [request for legal assistance]; *Yarbrough v. Superior Court* (1985) 39 Cal.3d 197, 201 [motion for appointment of counsel]; *Payne*, *supra*, 17 Cal.3d 908, 912 [request to attend trial].) That Garcia neither requested greater access nor objected to the trial court's arrangements for his telephonic access are fatal to his due process claim.

For the contrary proposition, Garcia relies on *Wantuch*, *supra*, 32 Cal.App.4th 786 in which the court recognized that "[a] prisoner may not be deprived, by his or her inmate status, of meaningful access to the civil courts if the prisoner is both indigent and a party to a bona fide civil action threatening his or her personal or property interests" and that "[m]eaningful access to the courts is the 'keystone' of an indigent prisoner's right to defend and prosecute bona fide civil actions." (*Id.* at pp. 790, 792.)

In *Wantuch*, a self-represented incarcerated plaintiff had requested that the court appoint counsel to represent him in his action against his one-time criminal defense attorney or, alternatively, that the court arrange for his transfer from state prison to court. (*Wantuch*, *supra*, 32 Cal.App.4th at p. 790.) The basis for Wantuch's request for appointment of counsel in the civil proceeding was that he was indigent, having initially engaged the defendant defense attorney by a promissory note secured by a deed of trust on real property, and having later qualified for the appointment of a public defender in his

8

criminal case.  (*Id.* at pp. 790-791.)  The trial court denied both motions and instead struck Wantuch's complaint and answer to the cross-complaint as a sanction for his nonappearance.  (*Id*. at p. 791.)  The appellate court reversed, finding that "Wantuch's nonappearance was not willful, but was solely the result of his imprisonment."  (*Id*. at p. 795.)

Unlike *Wantuch*, however, the record here does not establish any notice to the trial court of a claim of indigency, and Garcia makes no claim that he ever asked the trial court to appoint counsel for him.  Indeed, the trial court's register of actions reflects that Garcia had been represented by retained counsel in the civil proceedings from 2011 to early 2016, and the only indication in the record as to why Garcia ceased to be represented was his stated dissatisfaction with counsel's performance.  Garcia did not assert that he lacked the funds to hire counsel.  It was not until March 15, 2017, months after trial, that the record reflects Garcia's first application for a fee waiver.[4]  Absent a timely claim by Garcia of his inability to participate in the proceedings without appointment of counsel or personal appearance in the courtroom, the trial court had no obligation to explore either as a means of securing him access.

On this record, we conclude that Garcia voluntarily waived his right to participate telephonically in the trial proceedings and that he forfeited any claim as to the adequacy of telephonic participation by failing to object in the trial court.

## C.  Noneconomic Damages

The jury awarded Achilli $20 million in noneconomic damages of which 70 percent, or $14 million, was allocated to Garcia.  Garcia argues this award was

---

[4] Garcia at oral argument stated that in requesting leave to appear telephonically, the trial court waived associated fees.  But because he did not designate those records for inclusion in the clerk's transcript, we are unable to determine whether he established indigency, whether the trial court waived the fees because the call would be coming via a government agency exempt from fees, or even whether the trial court made any findings at all in its July 28, 2016 or September 28, 2016 orders.

excessive and so grossly disproportionate as to raise a presumption it was the result of passion or prejudice.

"A plaintiff in a wrongful death action is entitled to recover damages for his own pecuniary loss, which may include (1) the loss of the decedent's financial support, services, training and advice, and (2) the pecuniary value of the decedent's society and companionship—but he may *not* recover for such things as the grief or sorrow attendant upon the death of a loved one, or for his sad emotions, or for the sentimental value of the loss." (*Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783, 793.) Our review is deferential: "An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507 (*Seffert*).)

"There is no fixed standard by which we can determine whether a jury's award for this intangible loss of comfort and society is excessive. [Citation.] In the absence of some factor in the record such as inflammatory evidence, misleading instructions or improper argument by counsel that would suggest the jury relied upon improper considerations, we usually defer to the jury's discretion. [Citation.] The fact that the verdict is very large does not alone compel the conclusion the award was attributable to passion or prejudice. [Citation.] In assessing a claim that the jury's award of damages is excessive, we do not reassess the credibility of witnesses or reweigh the evidence. We consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor." (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 490.)

Garcia contends the $20 million award of noneconomic damages is so high that it "shocks the conscience[,]" though he acknowledges the absence of any fixed threshold beyond which an award is per se excessive. In its order on Garcia's motion for new trial, the trial court found "there was substantial and compelling evidence of the noneconomic

10

damages of [Achilli] from the loss of her father's love, companionship, comfort, assistance, affection, moral support, training and guidance, all proximately caused by her father's murder by defendants.  The jury received evidence of Plaintiff's father's life expectancy that he had prior to his death."  On that basis, the trial court denied Garcia's motion for new trial on the issue of noneconomic compensatory damages.  The trial judge's determination that a damages award is not excessive is entitled to great weight and "all presumptions are in favor of the decision of the trial court."  (*Seffert*, *supra*, 56 Cal.2d at p. 507.)  Here, the trial court's assessment was supported by substantial evidence that went unchallenged before the jury.

Garcia further argues that inflammatory comments in closing argument raise an inference that the award resulted from passion or prejudice.  Specifically, he points to counsel's contention that the jury should by its verdict "send a message."  It is true that "[a]ny suggestion that the jury should 'send a message' by inflating its award of damages . . . would be improper where . . . punitive damages may not be awarded." (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305, italics added.)  But an award of punitive or "exemplary" damages, where authorized, is by design a message of deterrence, both general and specific:  "a punitive damages award must send a message to the offender and others in similar positions that this sort of behavior will not be tolerated."  (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 26; Civ. Code, § 3294 [punitive damages, where authorized, are "for the sake of example"].) Achilli's counsel did on several occasions tell the jury to consider what message to send to the defendants and the community.  These statements were made almost exclusively in counsel's clearly demarcated discussion of punitive damages, and not in his earlier arguments about the determination on compensatory damages.

The sole reference to "sending a message" that counsel made in any relation to a discussion of compensatory damages was in counsel's discussion of apportionment of damages among the defendants.  Arguing that 80 percent of any award should be

11

apportioned to Garcia as the "mastermind" or "kingpin" of the murder-for-hire scheme, counsel argued: "So in terms of what I mentioned before about sending a message[,] both with your compensatory verdict and your punitive damages verdict, the kind of people that are gonna hear your message are not the guys on the bottom there. The guys at the top[,] [t]hose are the people that are gonna listen. Those are the people that are gonna hear what this jury had to say about this kind of behavior."

We do not construe these comments as on their face an appeal to inflate noneconomic damages beyond reasonable compensation. Nor does the record supply any other reason to question the jury's understanding of either the comments or what it might properly consider in quantifying noneconomic damages. The trial court properly instructed the jury on what it might legitimately consider in calculating such damages.[5] The court further admonished the jury not to let bias, sympathy, prejudice, or public opinion influence the verdict. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Therefore, it is not apparent that counsel's comments caused any harm or prejudice.

Garcia also asserts that evidence exists to rebut the evidence presented to the jury at trial regarding Achilli's relationship with her father. But on appeal, we review only the correctness of the judgment "as of the time of its rendition, upon a record of matters which were before the trial court for its consideration." (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) As we review the questions of law presented by the challenge to the judgment, questions of fact generally remain the province of the trial court. (*Ibid.*) The evidence upon which Garcia would have us rely was never before the jury, which had no reason or ability to anticipate it. To the extent Garcia presented new evidence to the trial

_____

[5] Garcia, at oral argument, noted the trial court's omission of CACI No. 3924, but this instruction by its plain terms is not to be administered where punitive damages may be awarded.

court in his motion for new trial, "[e]vidence justifying new trial among other requirements must be newly discovered, undiscoverable by reasonable diligence." (*Perrine v. Pacific Gas & Elec. Co.* (1960) 186 Cal.App.2d 442, 450.) Nothing in the record suggests the evidence Garcia submitted in support of his motion could not have been presented during the jury trial, had Garcia elected to participate.

Based on the record before it, the trial court found the jury's award of noneconomic damages should remain in place. We discern no error in that conclusion. The award is high, but nothing in the record supports a finding that it "shocks the conscience" or was based upon impermissible considerations.

## D. Punitive Damages

On this record, it is beyond dispute that Garcia "has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) As established by the California Supreme Court, however, a plaintiff seeking an award of punitive damages bears the burden of establishing not only (1) the reprehensibility of the defendant's acts in light of the whole record and (2) the compensatory damages awarded, but also (3) the wealth of the particular defendant. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 (*Neal*).) "[T]he function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Ibid.*) Disputing the third *Neal* factor, Garcia argues the award in this case of $1 million was excessive, asserting he was indigent at the time of trial and Achilli failed to prove otherwise.

We review an award of punitive damages under the substantial evidence standard of review, "in which all presumptions favor the trial court's findings and we view the record in the light most favorable to the judgment." (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 916 (*Kelly*).) " ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] . . . [Citations.] . . . [Citation.] Inferences may constitute substantial evidence, but they must

13

be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. [Citations.]' [Citation.]" (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360.)

"A plaintiff who seeks punitive damages ordinarily must introduce evidence of a defendant's net worth." (*Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 995 (*Myllyla*).) The punitive damages award must be "based on the defendant's financial condition at the time of trial." (*Kelly*, *supra*, 145 Cal.App.4th at p. 915.) The purpose of punitive damages is to deter future misconduct by the defendant; therefore, the question is whether the amount of damages " 'exceeds the level necessary to properly punish and deter.' " (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 (*Adams*); *Neal*, *supra*, 21 Cal.3d at p. 928.) An "award can be so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone*." (*Adams*, *supra*, 54 Cal.3d at p. 111.) To meet this burden, "under Civil Code section 3295, subdivision (c), the plaintiff is allowed, on a proper showing, to 'subpoena documents or witnesses to be available at the trial for the purpose of establishing the profits or financial condition' of the defendant. The plaintiff may also obtain pretrial discovery of that information." (*Adams*, *supra*, 54 Cal.3d at p. 122.)

Here, the trial court granted Achilli's motion to permit discovery of Garcia's financial condition. But the only such evidence before the jury was the testimony of Susan Farwell, Mark Achilli's former business partner. She and Mark Achilli sold Mountain Charley's and the 180 to Garcia for $1.2 million and $660,000, respectively. Garcia paid for Mountain Charley's in cash. For the 180, Farwell and Mark Achilli accepted a 20-percent down payment, allowing periodic payments on the balance. Farwell testified: "According to all records that [Garcia] . . . provided us and the bank statements and the loan he was able to procure, he gave us the impression that he was doing well in his mortgage broker . . . business, and that liquidity wouldn't be an issue by taking the security on the 180. He was able to secure the notes for … the 1.2 million

14

sale." Garcia's purchases, however, were in 2007 (over nine years prior to the trial), and Achilli presented no other evidence of Garcia's financial condition.

While certain inferences can be drawn from the trial evidence about Garcia's financial condition at the time of his purchase of the restaurants, "an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Adams*, *supra*, 54 Cal.3d at p. 109; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064.) There is no exclusive measure for determining a defendant's ability to pay, but there should be some evidence of the defendant's actual net wealth. (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680 (*Baxter*).) "Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income." (*Ibid*.; *Kelly*, *supra*, 145 Cal.App.4th at p. 915.)

In *Kelly*, for example, the trial court awarded $75,000 in punitive damages where the testimony at trial was that, less than two years before trial, the defendant had purchased a large home for approximately $800,000, in which he had about $200,000 in equity, and that the defendant had owned another home for eight to 10 years, in which defendant had once represented he had $400,000 to $500,000 in equity. (*Kelly*, *supra*, 145 Cal.App.4th at pp. 916-917.) The reviewing court noted there was no evidence whether—at the time of trial—he still owned the properties, or whether there were encumbrances on the properties at the time of trial, or whether the defendant had other liabilities. (*Id*. at p. 917) The court therefore reversed the punitive damages award. (*Id*. at p. 921.) In this case, calculating an appropriate sum of punitive damages based on the limited evidence presented would have necessitated a greater level of speculation than in *Kelly*, and the punitive damages awarded may not be based on speculation. (*Adams*, *supra*, 54 Cal.3d at p. 114.)

Achilli conceded at oral argument that Garcia might well be indigent. She suggests, however, that Garcia forfeited his right to object to the sufficiency of the

15

evidence at trial regarding his financial condition by failing to do so in the trial court, and that it was not Achilli's burden to rebut a claim of indigence Garcia never made to the jury. Although a party generally forfeits a claim by failing to timely raise it in the trial court, "[t]he contention that a judgment is not supported by substantial evidence . . . is an obvious exception to the rule." (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17.) Notwithstanding our conclusion above that Garcia failed to establish indigency for purposes of eligibility for appointment of counsel, it is the plaintiff who bears the burden of proving a defendant's financial condition for purposes of punitive damages. (*Adams*, *supra*, 54 Cal.3d at pp. 119-120.) "A plaintiff seeking punitive damages is not seeking a mere declaration by the jury that the plaintiff is entitled to punitive damages in the abstract. The plaintiff is seeking an award of real money in a specific amount to be set by the jury. Because the award, whatever its amount, cannot be sustained absent evidence of the defendant's financial condition, such evidence is 'essential to the claim for relief.' [Citation.]" (*Id.* at p. 119.) Conversely, "[i]t is inherently prejudicial to require a defendant to introduce evidence of personal finances." (*Id.* at p. 120.)

Achilli relies on *Myllyla* for the proposition that Garcia's denials in discovery that he had any financial accounts or anything else of value, and his absence at trial, should relieve her of her burden to obtain and present evidence at trial regarding Garcia's existing financial situation. She correctly concedes, however, that the record here does not demonstrate obstruction as severe as that in *Myllyla*. In *Myllyla*, the plaintiff had served the absent defendant with a notice to appear at trial and produce documents. The defendant had testified in the liability phase but, once the jury delivered its verdict and was to hear evidence on damages, "failed to comply with the notice to appear and Plaintiffs' demand for documents, which was the equivalent of a court order. Nor did he object to the validity of the notice or the demand at trial." (*Myllyla*, *supra*, 40 Cal.App.5th at pp. 996-997.) The court accordingly held that the defendant was estopped from challenging the punitive damage award on grounds of insufficiency of evidence of

his financial condition. (*Id.* at p. 997.) But Achilli at the pretrial conference acquiesced without objection to Garcia's decision not to participate, and there is no other record that Achilli had sought to compel his participation or production of documents at trial.

In some instances, a defendant's failure to comply with timely requests for discovery relating to his financial condition will excuse the plaintiff's failure to produce evidence at trial. (*Morgan v. Davidson* (2018) 29 Cal.App.5th 540, 551-552; *Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 193.) But a plaintiff's failure to raise such discovery issues " 'until the eve of the punitive damages phase of trial' may fatally undermine an otherwise valid claim for punitive damages." (*Id.* at p. 194.) Achilli cites the trial court's belief that the lack of evidence regarding Garcia's financial condition was the consequence of Garcia's willful nonparticipation at trial and failure to comply with pretrial discovery to disclose financial information. But the trial court's statement to this effect was itself based solely on an assertion by Achilli in opposition to Garcia's posttrial motions, when there is nothing in the record to establish whether and to what extent Garcia participated in discovery.

Achilli represented at oral argument that Garcia's retained counsel had conveyed Garcia's intention to invoke his Fifth Amendment privilege against self-incrimination if deposed, but the record reflects no effort to test the limits of Garcia's claim of privilege. It is the trial court that determines whether the privilege against self-incrimination applies. (*People v. Trujeque* (2015) 61 Cal.4th 227, 268.) Garcia of course had been subject to criminal prosecution, but the associated privilege against self-incrimination typically terminates "when the sentence has been fixed and the judgment of conviction has become final," as Garcia's had. (*Mitchell v. United States* (1999) 526 U.S. 314, 326.) If Garcia was purporting to assert the privilege as to purely financial matters, as opposed to his criminal conviction, a party who asserts the privilege typically must do so question by question, rather than by blanket invocation. (*Fuller v. Superior Court* (2001) 87 Cal.App.4th 299, 308.) But Achilli instead reportedly agreed with Garcia's counsel that a

17

deposition would not be worthwhile. On this record, we are unable to endorse the trial court's assumption that Garcia's absence in some way lessened Achilli's burden to prove Garcia's financial condition at the time of trial. (See, e.g., *Kelly*, *supra*, 145 Cal.App.4th at p. 918 [plaintiff bears burden of proof whether or not defendant testifies at trial].)

There is no question that the murder established by Garcia's final judgment of conviction merits punishment, both carceral and financial. Nevertheless, without evidence of Garcia's financial condition at the time of trial, there was no basis to determine the level of punitive damages necessary to properly punish and deter. Absent a record of obstruction of pretrial discovery, we have no choice but to reverse the trial court's award of punitive damages. As Achilli acknowledged at oral argument, reversal for insufficiency of the evidence does not entitle her to a new trial on punitive damages. (*Kelly*, *supra*, 145 Cal.App.4th at p. 919; *Baxter*, *supra*, 150 Cal.App.4th 673, 681.)

## III.   DISPOSITION

The award of punitive damages is reversed. The judgment is otherwise affirmed. The parties shall bear their own costs on appeal.

_____
LIE, J.

WE CONCUR:


_____
GREENWOOD, P.J.


_____
DANNER, J.


*Achilli v. Garcia*
**H044731**